IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KEVIN EUGENE KALLAND,<br><br>           Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>           Defendant. | CV 17-15-BLG-TJC<br><br>**ORDER** |

On January 31, 2017, Plaintiff Kevin Eugene Kalland ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  (Doc. 1.)  The Commissioner filed an Answer and the Administrative Record ("A.R.") on April 4, 2017.  (Docs. 5, 6.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for an award of

disability benefits.  (Doc. 10.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 11, 12.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the case should be **REMANDED** for further administrative proceedings.

## I.    PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI benefits in October 2013.[1] (A.R. 208-220.)  Plaintiff alleges he has been unable to work since June 1, 2008. (A.R. 210.)  The Social Security Administration denied Plaintiff's application initially on June 2, 2014 (A.R. 149-154), and upon reconsideration on October 9, 2014.  (A.R. 157-161.)  On December 11, 2014, Plaintiff filed a written request for a hearing.  (A.R. 162-164.)  Administrative Law Judge Michael A. Kilroy (the "ALJ") held a hearing on November 24, 2015.  (A.R. 40-94.)  On January 25, 2016, the ALJ issued a written decision.  (A.R. 13-39.)  The ALJ denied Plaintiff's application for disability insurance benefits, finding that Plaintiff was not disabled from the alleged onset date of June 1, 2008 through June 30, 2010, the date

_____

[1] Plaintiff's applications contained in the A.R. are dated November 7, 2013.  (A.R. 208-220.)  However, the parties and the ALJ all use an application date of October 3, 2013.  (A.R. 17; Docs. 1, 5.)  The Court finds that the discrepancy is immaterial and will use the parties' agreed-upon date of October 3, 2013, as the date of Plaintiff's application.

Plaintiff was last insured.  (A.R. 32.)  But the ALJ awarded SSI benefits, finding

Plaintiff was disabled beginning on October 3, 2013.  (*Id.*)  Plaintiff requested

review of the decision on March 25, 2016.  (A.R. 7-12.)  The ALJ's decision

became final on December 2, 2016, when the Appeals Council denied Plaintiff's

request for review.  (A.R. 1-6.)  Thereafter, Plaintiff filed the instant action.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial

review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g),

1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is

based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See*

*also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may

reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human*

*Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a

preponderance."  *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.      Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or

mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id.*

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III. FACTUAL BACKGROUND

### A. The Hearing

A hearing was held before the ALJ on November 24, 2015, in Billings, Montana, and the following testimony was provided.

//

//

### 1.    Plaintiff's Testimony

Plaintiff was 51 years old as of the date of the hearing.  (A.R. 51.)  He has lived in a multi-level home in Billings, MT with his wife at all times relevant.  (A.R. 51-52.)  He completed two years of college, and attained an associate's degree with a focus in psychology.  (A.R. 52.)  He knows how to use a computer, but has never used a computer for any job.  (A.R. 52.)  He served in the U.S. Army for three years as a generator mechanic; his discharge was not medically related.  (A.R. 52-53.)

Plaintiff sustained a right rotator cuff injury in a work-related incident in 2007.  He testified he has not worked full-time or close to full-time since 2007.  (A.R. 53.)  Plaintiff settled a worker's compensation claim for his shoulder, and testified that "they are responsible for my shoulder, medically, for my life as far as I know it."  (A.R. 54.)  As of the date of the hearing, the employer was paying for therapy and medication for Plaintiff's shoulder.  (A.R. 54.)

When asked about his major medical issues, Plaintiff responded that his shoulder is "always going to be an issue" and is deteriorating, as his doctor told him it would.  Plaintiff also described nerve pain and neck pain of unknown etiology, headaches, and severe neuropathy in his feet that was aggravated on the left side by a medical procedure.  (A.R. 54-55.)

The record establishes that Plaintiff underwent three separate shoulder surgeries between his injury in 2007 and June 2009, with a fourth surgery occurring in October 2011. Plaintiff's attorney asked Plaintiff his understanding of why he had three shoulder surgeries. (A.R. 62.) Plaintiff explained that the anchor point where the doctor attached the tendon in his initial surgery was "very soft," and the tendon was not staying in place appropriately. (A.R. 62.) Plaintiff was beginning to improve following the third surgery, but he got an MRI following a period of increased pain that revealed that the anchor was loosening again. (A.R. 62-63.) It took more than a year for Plaintiff to have a fourth surgery following that MRI. (A.R. 64-65.) Plaintiff said the delay was primarily a result of his difficulty convincing his treaters to order the MRI, but also he was told that there may be no additional surgery that would be of help to him. (A.R. 64-66.)

Plaintiff was sent to the University of Washington for further treatment. He explained that his surgeon in Billings ("Dr. Willis") believed he had exhausted his abilities, and referred Plaintiff elsewhere for another opinion. In a fourth surgery, a Dr. Gofeld at the University of Washington removed the aforementioned anchor that had worked loose. (A.R. 68-69.)

As for his nerve pain, Plaintiff testified his "nerve pain really started spreading in the fall of 2008, between the second and third surgery." (A.R. 64.)

Plaintiff received an injection in the axillary nerve in or around October 2008. Approximately two weeks later, he experienced severe nerve pain throughout his body after taking a shot during a game of pool. (A.R. 64.) Plaintiff testified that the nerve pain has since "spread into fibromyalgia," and that he has been diagnosed with idiopathic nerve pain. (A.R. 64.)

As for nonsurgical treatment, Plaintiff testified he has received multiple injections in his axillary nerve, which he believes he damaged when he tore his rotator cuff initially. (A.R. 66.) He received what he calls "blind injections," which were injections not guided by any assisted imaging. (A.R. 66-67.) Eventually, he received injections guided by ultrasound, which were "a lot more helpful." (A.R. 67.) Plaintiff has also had epidural injections, a medial branch block injection, a facet injection, occipital injections, and radiofrequency ablation. (A.R. 67.) When asked why he had so many injections, Plaintiff responded that he did not know, but that "they were trying to eliminate the pain in [his] neck and the headaches.…" (A.R. 67.) Plaintiff reported soreness immediately following the injections, and he estimated that only 30-40% of them provided relief. (A.R. 67-68.)

Regarding his current physical limitations, Plaintiff estimated that he could walk about 2 blocks; stand for 20 minutes at a time; sit for 1-1.5 hours; and lift 10

pounds frequently and 20 pounds occasionally, per medical restrictions, but probably 40-50 pounds actually. (A.R. 56-57.) Other than this weight lifting restriction, Plaintiff testified he is not aware of any physical restrictions imposed by a treating physician. (A.R. 74.)

Regarding his physical activities, Plaintiff testified that he used to play golf regularly but cannot anymore. Plaintiff has attempted chipping and putting in the time since his alleged onset date, but has not attempted a full golf swing. (A.R. 57-58.) Plaintiff is careful with his right hand when he performs any movements away from his body because "[i]t's always felt very weak." (A.R. 70.) He testified that he keeps his arm close to his body, never lifts anything out away from his body, and never lifts anything above his shoulder. (A.R. 70.)

Plaintiff testified that water therapy, ice treatments, and medications are instrumental in allowing him to "get up and sit down when I need to, and lay down when I need to, that type of thing." (A.R. 82.) He testified that he uses ice on his neck for 20 minutes at a time every 2-3 hours. (A.R. 71.) Plaintiff typically lays down twice per day for 30 minutes at a time. (A.R. 84.) Between the third and fourth surgeries, Plaintiff sat in a recliner wearing the "cryo cuff," instead of laying down. (A.R. 84.) He explained a cryo cuff is a cuff that circulates cold water. (A.R. 76.)

Plaintiff testified that he "might be able to do something if there was – if there was a job that would allow you to do all these different things," presumably referring to the aforementioned therapy treatments. (A.R. 82.) Plaintiff discussed becoming involved with vocational rehabilitation in an attempt to find a job he could perform in the afternoons. (A.R. 83.)

The ALJ asked Plaintiff to describe a normal day. (A.R. 71.) Plaintiff testified to the following: he wakes at 7:00 a.m.; during the first hour, he takes Omeprazole for his esophagus; once that takes effect after about a half hour, he eats breakfast, and then takes more medications; he does 10 minutes of traction in the morning; twice per week he goes to St. Vincent Healthcare for physical therapy at noon; and in the afternoons he attempts to do housekeeping, such as laundry, although "[m]ost of the time" he lays in bed with ice on his neck. (A.R. 71-74.)

The ALJ then refocused the discussion to the time period between Plaintiff's third surgery in June 2009 and his fourth surgery in October 2011. Plaintiff testified he "was really dealing with a lot of nerve pain back then," but that he did not have the headaches and foot pain he was experiencing at the time of the hearing. (A.R. 74.) He was trying a lot of new medications that caused various side effects, such as dry mouth and throat. (A.R. 74-75.) Plaintiff was supposed to be using his CPAP, but it was causing him to get less sleep due to discomfort.

(A.R. 75-76.)  Plaintiff attempted acupuncture, which helped for a few months but not after that.  (A.R. 76.)  Plaintiff was experiencing pain mostly in his chest wall, around his arm and shoulder blade, and his neck.  (A.R. 76.)  He often used the cryo cuff on his neck (A.R. 76-77); and he was also doing TheraBand therapy at that time, but could not do so on "bad days."  (A.R. 81.)

Plaintiff testified that he was having more bad days than good during that time, but there were also days that he felt like his condition was improving.  (A.R. 78.)  On a bad day, Plaintiff stated that he "was really miserable."  (A.R. 78.)  He had scapular nerve pain, weakness in his arm, and pain indicating that his shoulder was torn again.  (A.R. 78-79.)

Plaintiff further testified that there was "a lot of limit" to the household chores he could perform during that time, although he only specifically mentioned being unable to drive a manual-shift vehicle.  (A.R. 80.)

Regarding work-related activities during this period, Plaintiff testified that his former employer suggested that he return "to do light duty shifts" at some point following his third surgery.  (A.R. 80.)  But Plaintiff did not return because he was concerned that he would "be looked at kind of in a bad way because…I'm getting paid the same as [the rest of his crew] are, and they're doing all the work."  (A.R. 80.)  Plaintiff was eventually terminated for "job abandonment."  (A.R. 80-81.)

The ALJ inquired about records that indicate Plaintiff earned income from self-employment during 2008-2010. (A.R. 85.) Plaintiff explained that he sold insurance for Capitol American Insurance Company from 1991 through 1994, and the income was residual payments from policies Plaintiff had sold. (A.R. 85-86.)

## 2. Vocational Expert's Testimony

Delane Hall, a Vocational Expert (the "VE"), also testified before the ALJ. (A.R. 87-91.) The ALJ asked the VE two hypothetical questions. First, the ALJ asked the VE to assume an individual with the following characteristics: 44 to 46 year-old age category; high school diploma; no computer use in the work setting; can be on one's feet in some combination, given breaks, for no more than 4 hours total in an 8-hour day; can sit for an hour at a time and, with breaks, 6-8 hours in an 8-hour day; can lift 20-30 pounds occasionally, and 10 pounds frequently; can never crawl or climb ladders and scaffolding; can perform all other postural activities occasionally; with respect to bilateral upper extremities, cannot perform any activity which would be repetitious throughout an 8-hour period, but can perform frequent gross and fine motor activities; and should avoid concentrated exposure to extreme cold and vibrations. (A.R. 87-88.) The VE stated that such a person could perform Plaintiff's past work of group worker. The VE said the

individual could also perform the jobs of information clerk and telephone answering service operator.  (A.R. 88-89.)

Second, the ALJ asked the VE two assume a person who for any reason, pain or otherwise, would need breaks to exceed by 10 minutes or more the two 15-minute breaks allowed during a shift and/or the 30-60 minute break allowed mid-shift; would need any or all breaks on at least on occasional basis; and/or were to miss more than two workdays in a typical work month on an occasional basis.  The ALJ then asked if those limitations, overlaid on the first hypothetical, would allow the individual to work at the substantial gainful activity level.  (A.R. 89.)  The VE replied, "no."  (A.R. 89.)

The VE provided the following additional testimony upon questioning by Plaintiff's counsel.  First, the VE said his answer to the last hypothetical would not change if the person were to miss several days or a week every few months.  (A.R. 90.)  Next, Plaintiff's counsel asked if an employer would accommodate scheduled medical appointments twice per week; the ALJ said that probably would be an issue during a probationary period, but that it may be less of an issue once the individual becomes proficient.  (A.R. 90-91.)

/ / /

/ / /

### 3. ALJ's Decision on the Record

The ALJ stated on the record that he would find Plaintiff to be disabled "for the latter period of time." (A.R. 46-47, 91-92.) But he had not made a determination for "the earlier period of time." (A.R. 46-47, 92.) A review of the ALJ's decision indicates that October 3, 2013 (the date Plaintiff protectively filed a Title XVI application), is the demarcation point the for the "later period" and that the "earlier period" is the period from Plaintiff's alleged onset date of June 1, 2008, through June 30, 2010, the date last insured. (A.R. 17, 22.) The ALJ also ordered a review of Plaintiff's disability two years after the hearing date, in order to determine whether Plaintiff had improved to such a degree that he is no longer disabled. (A.R. 93.)

### B. Medical Evidence

The A.R. also includes the following pertinent medical records generated during the time period the ALJ found Plaintiff to be not disabled. Additional records may be discussed below as appropriate.

#### 1. Treating Physician Evidence

##### a. Michael C. Willis, MD

Dr. Willis in an orthopedic surgeon who treated Plaintiff's shoulder injury. He performed the first three of Plaintiff's surgeries. Dr. Willis's first treatment

note after the alleged onset date is dated June 13, 2008, which relates to Plaintiff's second surgical procedure to repair Plaintiff's right rotator cuff. (A.R. 718-721.) Dr. Willis provides a preoperative diagnosis of "[r]ight shoulder recurrent rotator cuff repair with persistent pain, limiting function," and a postoperative diagnosis of "[r]ight shoulder recurrent rotator cuff tear of suprasinatus with extensive adhesive capsulitis, subdeltoid adhesions, and significant osteoporosis of the greater tuberosity." (A.R. 718.) Dr. Willis notes a successful surgical repair with no complications. (A.R. 720.)

Plaintiff returned to Dr. Willis on August 4, 2008. (A.R. 714-715.) Other than some diffuse numbness and tingling in the hand, Plaintiff status post-surgery was unremarkable. (A.R. 714.) Dr. Willis estimated that Plaintiff would reach maximum medical improvement in 3 months. (A.R. 715.)

Dr. Willis's note dated September 30, 2008, states that Plaintiff "reports that he continues to have moderate discomfort in the anterior glenohumeral region, though he has not required any opiate pain pills." (A.R. 706.) Dr. Willis believed that Plaintiff's rotator cuff had healed, and estimated maximum medical improvement in 8 weeks. (A.R. 707.)

On November 10, 2008, Dr. Willis noted Plaintiff's report of "significant discomfort particularly about the posterolateral aspect of his shoulder." (A.R.

708.)  Dr. Willis noted that Plaintiff's pain "is limiting both sleep as well as activities of daily living."  (A.R. 709.)

On November 24, 2008, Dr. Willis noted continued pain at the posterolateral shoulder, and additional "burning pain" toward the lateral aspect of the upper brachium.  (A.R. 704.)  Dr. Willis administered a trigger point injection.  (A.R. 705.)

Dr. Willis noted on December 15, 2008, that the trigger point injection resulted in one or two days of relief of his pain; however, Plaintiff reported his pain returned "with vengeance."  (A.R. 701.)  Plaintiff reported pain radiating down his arm and into his back.  (A.R. 701.)

Plaintiff saw Dr. Willis next on January 12, 2009, complaining of "severe pain . . . causing him such pain that he has actually been crying on occasion."  (A.R. 699.)  Dr. Willis wrote Plaintiff a prescription for Percocet and ordered an MRI.  (A.R. 700.)  Dr. Willis noted that Plaintiff "will not return to work at this time."  (A.R. 700.)

On April 28, 2009, Dr. Willis noted "persistent pain related to [Plaintiff's] rotator cuff and possible pain related to the quadrilateral space."  (A.R. 682.)  Dr. Willis suggested "repeat arthroscopy to evaluate his rotator cuff and potential

posterior evaluation of his quadrilateral space to open incision for possible axillary nerve decompression." (A.R. 682.)

On June 4, 2009, Dr. Willis noted "MRI evidence of likely recurrence of rotator cuff tear following revision repair and axillary neuropathy secondary to quadrilateral space syndrome." (A.R. 680.) Dr. Willis recommended another surgery, but discussed possible complications given Plaintiff's diagnosis of complex regional pain syndrome. (A.R. 680.)

Dr. Willis performed a third surgery on June 12, 2009. (A.R. 675-678.) He provided the postoperative diagnoses of recurrent rotator cuff tear, supraspinatus; acromioclavicular joint arthrosis contributing to impingement; quadrilateral space syndrome; and subacromial adhesions. (A.R. 675.) Dr. Willis reported no complications with the surgery. (A.R. 677.)

Plaintiff reported to Dr. Willis on October 29, 2009, that he was having nerve pain in his right shoulder. (A.R. 663-664.) Dr. Willis referred Plaintiff to a neurologist. (A.R. 664.)

Dr. Willis saw Plaintiff again on February 1, 2010. (A.R. 647-648.) Plaintiff reported "that on a daily basis his shoulder function is improved, though if he uses his shoulder quite a bit he has increasing pain." (A.R. 647.) Dr. Willis

noted that "[a]t this point in time, I would not recommend any further orthopedic intervention." (A.R. 648.)

On May 25, 2010, Plaintiff returned to Dr. Willis, complaining of continued significant pain, "which is limiting his activities of daily living." (A.R. 632.) Dr. Willis wrote that Plaintiff "certainly does have evidence of a recurrent rotator cuff tear." (A.R. 633.)

On August 12, 2010, Dr. Willis authored a lengthy progress report, describing Plaintiff's shoulder issues to that date, and indicated that Plaintiff's "continued symptomology" included an "[i]nability to return to prior work status or functional status and recreational activities," due to "[c]hronic right shoulder pain, with MRI evidence of recurrent rotator cuff tear" and "neurogenic discomfort." (A.R. 613.)

### b.    James Guyer, MD

Dr. Guyer examined Plaintiff on July 7, 2009, and assessed Plaintiff as suffering from rotator cuff syndrome. (A.R. 440.) Plaintiff saw Dr. Guyer again on June 30, 2010, and Dr. Guyer confirmed that an MRI showed another rotator cuff tear. Dr. Guyer informed Plaintiff that he may not be a candidate for repair after two prior surgeries. (A.R. 412.)

/ / /

### c.       Steven D. Arbogast, DO

Dr. Arbogast is a neurologist who treated Plaintiff on January 7, 2010.

(A.R. 654-660.)  He noted persistent and prolonged shoulder pain.  (A.R. 654.)  Dr.

Arbogast ordered an MRI to evaluate Plaintiff's sensory loss.  (A.R. 660.)

Dr. Arbogast noted on January 22, 2010, that the MRI did not show an

obvious source of Plaintiff's pain, but that an EMG was suggestive of right C7

cervical radiculopathy.  (A.R. 653.)  He believed Plaintiff may benefit from an

evaluation by anesthesiology for an epidural injection or C7 focal nerve block.

(A.R. 653.)

Plaintiff again visited Dr. Arbogast on May 20, 2010.  (A.R. 634-637.)  Dr.

Arbogast ordered an MRI at Plaintiff's request, which ultimately revealed another

rotator cuff tear.  (A.R. 420, 636.)

### 2.       Non-Examining Physician Evidence

### a.       William Fernandez, MD

Dr. Fernandez reviewed Plaintiff's medical records, but did not examine

him, and did not testify at the hearing.  He issued an opinion on May 24, 2014.

(A.R. 95-105.)  Dr. Fernandez opined that Plaintiff could lift and carry 20 pounds

occasionally and 10 pounds frequently.  (A.R. 102.)  Dr. Fernandez found Plaintiff

can stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-

hour work day.  (A.R. 102.)  Dr. Fernandez also stated Plaintiff is limited to

occasional pushing and pulling with his right upper extremity.  (A.R. 102.)  He

said Plaintiff can frequently climb ramps/stairs, balance, stoop, kneel, and crouch;

and occasionally climb ladders/ropes/scaffolds and crawl.  (A.R. 102-103.)  Dr.

Fernandez also found Plaintiff is limited to occasionally reaching laterally or

overhead with his right upper extremity, but he has no limitations with handling,

fingering, or feeling, or reaching in front.  (A.R. 103.)  He stated Plaintiff should

avoid concentrated exposure to cold, fumes, odors, gases, and poor ventilation, and

should avoid even moderate exposure to hazards.  (A.R. 103-104.)  Dr. Fernandez

ultimately concluded that Plaintiff is not disabled.  (A.R. 105.)

### b.   Marsha McFarland, PhD

Dr. McFarland reviewed Plaintiff's medical records, but did not examine

him, and did not testify at the hearing.  She issued an opinion on May 30, 2014.

(A.R. 95-150.)  Dr. McFarland noted that Plaintiff had been diagnosed with the

severe impairments of anxiety disorder and affective disorder.  (A.R. 100.)  She

opined that there is insufficient evidence in the record to substantiate the presence

of an affective disorder; however, she also noted the presence of an anxiety-related

disorder that does not precisely satisfy any diagnostic criteria.  (A.R. 100.) With

respect to that non-specific disorders, Plaintiff has mild restriction of activities of

daily living; mild difficulties in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation. (A.R. 100.)

### c. Kimberlee Terry, MD, and Mark Berkowitz, PsyD

Dr. Terry and Dr. Berkowitz reviewed Plaintiff's records at the reconsideration phase, and affirmed the findings of Dr. Fernandez and Dr. McFarland. (A.R. 119-132.) There are no significant departures from the earlier review, though an increase in Plaintiff's headaches, muscle cramping, and neuropathy were noted. (A.R. 120.)

## C. The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 1, 2008. (A.R. 19.) Second, the ALJ found that Plaintiff had the following severe impairments since the alleged onset date: "fibromyalgia, sleep apnea, and right shoulder dysfunction" (A.R. 19-20); the ALJ next found that Plaintiff had the following sever impairments since the established date of disability of October 3, 2013: "fibromyalgia, sleep apnea, peripheral neuropathy, and right shoulder dysfunction." (A.R. 20-21.) Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meet or medically equal any one of the impairments in the Listing

of Impairments. (A.R. 21-22.) Fourth, with respect to the period from June 1,

2008, through June 30, 2010, the ALJ stated Plaintiff had the residual functional

capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift 30 pounds occasionally and 10 pounds frequently; be on his feet for 4 hours in an 8-hour workday; sit for 1 hour at a time, with normal breaks, for a total of 8 hours in an 8-hour workday; never crawl or climb ladders or scaffolding occasionally perform all other postural activities; and perform gross and fine motor activities with his bilateral upper extremities, but never engage in any of these activities repetitiously. He must avoid concentrated exposure to extreme cold and vibration.

(A.R. 22-28.) With respect to the period beginning October 3, 2013, the ALJ

stated Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), as specifically set forth in paragraph 5, above, and will also occasionally require breaks in excess of 10 minutes, in addition to the typical 15-minute morning and afternoon work breaks and/or the mid-shift 30-60-minute meal break (10 minutes or more added onto any or all of the breaks on at least an occasional basis), and/or he will occasionally miss more than two workdays per typical work month.

(A.R. 28-30.)

The ALJ next found that Plaintiff has been unable to perform any past

relevant work since the alleged onset date. (A.R. 30.) The ALJ further found,

however, that Plaintiff was able to perform representative occupations such as

information clerk and telephone answering service operator prior to October 3,

2013.  (A.R. 31-32.)  The ALJ found that there were no jobs in the national economy that Plaintiff could perform after October 3, 2013.  Thus, the ALJ found that Plaintiff was not disabled prior to October 3, 2013, but became disabled on that date.  (A.R. 32.)

Consequently, this review is limited to the question of Plaintiff's disability between June 1, 2008, and June 30, 2010.

## IV. DISCUSSION

Plaintiff argues that the ALJ erred by failing to provide specific germane reasons for discounting his credibility; erroneously discounting the opinions of treating physicians and other source medical providers; erroneously failing to find that Plaintiff met the requirements for Listings 1.07 and 1.08; and failing to include all impairments in the hypothetical to the vocational expert.

The Commissioner argues the ALJ reasonably found that Plaintiff's activities were inconsistent with her alleged limitations, and that objective medical evidence contradicted Plaintiff's statements concerning her symptoms and limitations.  The Commissioner further argues the ALJ properly determined Plaintiff's severe impairments, and that the ALJ properly found that Plaintiff did not meet a listing.

/ / /

## A.     The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ made only a general credibility finding without providing clear and convincing reasons for rejecting his testimony.  Plaintiff further argues that his testimony was fully supported by the objective medical evidence.  The Commissioner counters that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so.  *Id.*

"In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the

claimant's complaints." *Reddick*, 157 F.3d at 722 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

Here, the first step of the credibility analysis is not at issue. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her impairments. The Court finds that the ALJ failed to do so.

First, the Court notes that the ALJ appears to have fully credited Plaintiff's testimony with respect to the post-October 2013 period, during which the ALJ deemed Plaintiff to be disabled. With respect to the period between June 1, 2008 and June 30, 2010, however, the ALJ found that Plaintiff's impairments could reasonably be expected to cause his alleged symptoms, but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to October 3, 2013, for the reasons explained in this decision." (A.R. 27.)

In support of this finding, the ALJ cited Plaintiff's testimony and unspecified medical records which indicate that his symptoms had become worse since the 2008-2010 time period. (A.R. 27.) The ALJ also pointed to "significant evidence" in unspecified treatment records that "he retained strength and range of motion and was able to participate in some recreational activities." (A.R. 27). These do not constitute specific, clear, and convincing reasons to discredit Plaintiff's testimony.

First, a finding that Plaintiff's symptoms became worse over time does not establish that he was not disabled during the earlier time period. The ALJ appears to recognize this, stating "[w]hile such comparisons do not, alone, establish that the claimant was not disabled before the [date of last insured], they do set relevant benchmarks." (A.R. 27.) That, of course, is true only if it is obvious where the demarcation point between "disabled" and "not disabled" lies, thereby establishing a relevant "benchmark." More importantly, however, even if Plaintiff's symptoms became worse over time, the ALJ does not explain why that should impact Plaintiff's credibility. In fact, the ALJ specifically cites Plaintiff's testimony in support of his finding that his symptoms have become worse.

The same is true with respect to the ALJ's finding that Plaintiff "retained strength and range of motion" and that he participated in "some recreational

activities." Even if true, the ALJ does not explain why these findings impact Plaintiff's credibility, or how they are in any way inconsistent with Plaintiff's testimony.

Moreover, although the ALJ summarized Plaintiff's medical records regarding his physical conditions, the ALJ did not link Plaintiff's testimony to any particular part of the record that would support his non-credibility determination.

In *Brown-Hunter*, 806 F.3d at 489, the Ninth Circuit held an ALJ fell short of providing specific, clear, and convincing reasons for rejecting a claimant's testimony by merely reciting the medical evidence in support of his RFC finding. The Court explained that summarizing the medical record "is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Id.* at 494 (emphasis in original). The Ninth Circuit also emphasized that the ALJ must identify specifically *which* of the claimant's statements she found not credible and *which* evidence contradicted that testimony. *Id.* at 493-494.

Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit

the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."); *Brown-Hunter*, 806 F.3d at 492 ("[A]lthough we will not fault the agency merely for explaining its decision with 'less than ideal clarity,' . . . we still demand that the agency set forth the reasoning behind its decision in a way that allows for meaningful review.") (citation omitted).

Because the ALJ failed to point to the specific parts of Plaintiff's testimony he found not credible, and failed to link that testimony to particular parts of the record, the ALJ erred. *Brown-Hunter*, 806 F.3d at 494. As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons. The Court further finds that the error is not harmless.

An ALJ's error is harmless if it is "inconsequential to the ultimate nondisability determination." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). A proper determination of Plaintiff's credibility may affect the ALJ's RFC assessment and the VE's evaluation, and thus affect the outcome of Plaintiff's disability claim.

**B.    Treating Physician and Other Medical Source Evidence**

Plaintiff argues the ALJ failed to give proper weight to the opinions of his treating physicians. The Commissioner responds that the ALJ gave the opinions proper weight. The Court notes first that Plaintiff does not point to any "opinions"

that he believes were not property credited; rather, he merely cites the medical records and concludes therefrom that the ALJ erred. But treatment notes and medical opinions are not synonymous, and a treatment note that does not state a medical opinion is not subject to the same scrutiny applied to a medical opinion. *Modesitt v. Astrue*, 2010 WL 3749290, *8 (C.D. Cal. Sept. 21, 2010). To the Court's knowledge, the only opinion stating that Plaintiff could not work during the germane time period was provided by Dr. Willis. The Court accordingly will limit its review to that opinion; the Court finds that the ALJ failed to credit it properly.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. The Commissioner applies a hierarchy of deference to these three types of opinions. The opinion of a treating doctor is generally entitled to the greatest weight. *Id*. ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2). "The opinion of an examining

physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id. See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

If the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p). Nevertheless, in that event the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to accord the opinion. *See* Social Security Ruling 96-2p (stating that a finding that a treating physician's

opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."). The factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

Opinions of treating physicians may only be rejected under certain criteria. *Lester,* 81 F.3d at 830. To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons." *Id.* To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751. "The

ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725.  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis in original).  However, "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

Dr. Willis treated Plaintiff for a number of years, and his treatment records form a substantial portion of the germane medical evidence in this case.  As discussed above, and as noted by the ALJ, Dr. Willis "opined in August 2010 that the claimant could not return to his prior work status or functional status…due to chronic right shoulder pain, recurrent rotator cuff tear, and neurogenic discomfort." (A.R. 27, 613.)  The ALJ noted additionally that "Dr. Willis is personally knowledgeable about the claimant's condition, and it is possible that he is referring to the entire period since the [alleged onset date]."  (A.R. 27.)

The ALJ dispenses with Dr. Willis's opinion in two short sentences, writing "his opinion states little more than a finding reserved to the Commissioner.

Further, he has no vocational expertise." Thus, according to the ALJ, "[h]is opinion is given little weight." (A.R. 27.) These short conclusory sentences do not constitute specific and legitimate reasons for discounting Dr. Willis's opinion.

First, it is factually incorrect that Dr. Willis's "opinion states little more than a finding reserved to the Commissioner." Dr. Willis presented his opinion regarding Plaintiff's inability to work in the context of a lengthy progress report, which detailed Plaintiff's shoulder injury history, surgical timeline, and contemporaneous nerve problems, ultimately concluding that "it is more likely probable than not that all of [Plaintiff's] symptoms are related to his original injury dated 05/26/2007." (A.R. 615.) Dr. Willis's opinion is thoroughly supported and goes far beyond the ALJ's description of it as "little more than a finding reserved to the Commissioner."

The ALJ is correct that the Commissioner is not bound by the opinion of a treating physician on the ultimate issue of disability. *See* SSR06-03, 2006 WL 2263437 (citing 20 C.F.R. § 404.1527). At the same time, the Ninth Circuit has made clear that the ALJ cannot simply reject a treating physician's opinion on the ultimate issue of disability without providing sufficient reasons for doing so. *See e.g. Ghanim v.* Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) ("an ALJ may not simply reject a treating physician's opinion on the ultimate issue of disability");

*Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) ("[i]f the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physician's opinion"); and *Matthews v. Shalala,* 10 F.3d 678, 680 (9th Cir. 1993) ("[t]he administrative law judge is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, but he cannot reject them without presenting clear and convincing reasons for doing so.")

Moreover, an opinion on the ultimate issue of disability would be that the Plaintiff met the statutory definition of disability under the Act. That is not what Dr. Willis opined. Rather, Dr. Willis opined that Plaintiff's medical issues have resulted in an "[i]nability to return to prior work status or functional status" due to various medical impairments. (A.R. 613.) That is Dr. Willis's medical opinion, not a "finding reserved to the Commissioner." The ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record" in order to reject those opinions. *Molina*, 674 F.3d at 1111.

The only other reason the ALJ provided for rejecting Dr. Willis's opinion is that Dr. Willis "has no vocational expertise." (A.R. 27.) The ALJ does not disclose how he arrived at that conclusion, and the Court finds no support for the conclusion in the record. Moreover, the finding appears contrary to the

requirement that the opinions of treating physicians – regardless of their experience with disability evaluation – are generally to be given deference. Thus, the Court finds that it is not a specific and legitimate reason to disregard Dr. Willis's opinions.

Finally, in rejecting Dr. Willis's opinions, the ALJ did not cite or consider the factors provided in 20 C.F.R. § 404.1527(c) for evaluating the a treating physician's opinions.

Accordingly, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence in the record for discounting Dr. Willis's opinion regarding Plaintiff's inability to return to prior work status.

### C.    Whether Plaintiff Meets a Listing

Plaintiff next argues the ALJ erred in finding that he did not meet either Listing 1.07 or 1.08. The Commissioner asserts the ALJ properly determined Plaintiff's listing status. The Court agrees with the Commissioner.

"If a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step three." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (citing 20 C.F.R. § 404.1520(d)). "[A] claimant carries the initial burden of

proving a disability," including establishing at step three that he meets a listing. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

Plaintiff presents almost no actual legal argument to support his argument that the ALJ erred with respect to his evaluation of the listings. Rather, he declares that the ALJ erred, copies the germane listings into his briefs, lists some medical records, and then declares again that the ALJ erred. (*See e.g.* Doc. 10 at 17-20.) Missing from Plaintiff's briefs is any attempt to explain to the Court which medical records are germane to which facet of which listing, and why Plaintiff satisfies every specific finding required by that listing. *See Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim.") (emphasis omitted).) In any event, the Court finds that Plaintiff does not meet either Listing 1.07 or 1.08.

Listing 1.07 applies to a "[f]racture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. § 404, Subpt. P, App. 1, 1.07. As the ALJ explained, Plaintiff does not meet this Listing because he has not been diagnosed

with a fracture of an upper extremity, much less a fracture that meets all the requirements of Listing 1.07. (A.R. 21-22.)

Listing 1.08 applies to a "[s]oft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. § 404, Subpt. P, App. 1, 1.08. Plaintiff also does not meet this Listing.

First, Plaintiff makes no effort to establish that his shoulder injury is the type of harm contemplated by the Listing. The Listing also does not define the scope of soft tissue injuries included, other than to cite "burns" as an example. While the Court appreciates that Plaintiff's rotator cuff injury may be deemed a "soft tissue injury," as opposed to an injury to a bone, such an injury is altogether different from a burn. It would appear that Plaintiff's shoulder injury is more appropriately considered under Listing 1.02, which describes "[m]ajor dysfunction of a joint." 20 C.F.R. § 404, Subpt. P, App. 1, 1.02. The ALJ also explained why Plaintiff cannot meet Listing 1.02. (A.R. 21.) Plaintiff does not challenge that conclusion.

Nevertheless, even if his injury could fall within the meaning of Listing 1.08, Plaintiff fails to present any argument, much less supporting authority, that

his impairment meets the severity of the Listing. Listing 1.08 has four elements:

"(1) a soft tissue injury of an upper or lower extremity, trunk, or face and head; (2)

under continuing surgical management, as defined in [1.00m]; (3) directed toward

the salvage or restoration of major function; and (4) such major function was not

restored or expected to be restored within 12 months of onset." *Kiernan v. Astrue*,

2013 WL 2323125 at *6 (E.D.Va. May 28, 2013).

Regardless of his ability to establish the first three requirements, Plaintiff

cannot establish the fourth requirement that a major function has not been restored.

Listing 1.08 does not define what is meant by loss or restoration of a major

function. Courts which have considered the Listing, however, have applied the

definition of a "functional loss" under 20 C.F.R., § 404, Subpart. P., App.1, §

1.00(B)(2). *See e.g.*, *Murray v. Commissioner of Social Sec.*, 2014 WL 4199725

*12 (E.D. N.Y August 21, 2014) (collecting cases). Under that regulation,

"functional loss for purposes of these listings is defined as the inability to ambulate

effectively…or the inability to perform fine and gross movements effectively…."

Since there is no question of Plaintiff's ability to ambulate, he would need to be

unable to perform fine and gross movements effectively to fall within the

definition. That functional loss is defined under defined under § 1.00(B)(2)(c) as:

> an extreme loss of function of both upper extremities; *i.e.*, an
> impairment(s) that interferes very seriously with the individual's ability

to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

Obviously, Plaintiff has not sustained a loss of function within the meaning of this Listing. He has not lost the function of both upper extremities, and there is no evidence to support the conclusion that he does not have the ability to carry out the representative activities of daily living.

Finally, Plaintiff argues that the ALJ erred in not finding that he equaled a Listing. "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment, or, if a claimant's impairment is *not* listed, then to the listed impairment most like the claimant's impairment." *Tackett*, 180 F.3d at 1099 (emphasis in original). The Ninth Circuit, citing *Sullivan v. Zebley*, 493 U.S. 521 (1990), has explained the standard to determine whether a claimant equals a listing:

*Zebley* held that, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed

impairment." *Id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a) (1989)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* The reason for this is clear. Listed impairments are purposefully set at a high level of severity because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary."

*Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013.)

As in *Kennedy*, Plaintiff here has not advanced any argument as to why his impairments should be held to equal either Listing 1.07 or 1.08. The Court declines Plaintiff's invitation to remand the question for the ALJ to "explain the thought process" where Plaintiff has made no effort to demonstrate why he ultimately should prevail.

For the foregoing reasons, the Court finds that the ALJ did not err in determining that Plaintiff does not meet or equal a Listing.

## D. Hypothetical Questions Posed to the Vocational Expert

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the

vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422. *See also Shumaker v. Astrue*, 657 F.Supp.2d 1178, 1180 (D. Mont. 2009) (holding where the ALJ's hypothetical questions did not accurately reflect the claimant's restrictions established by the medical record, "the ALJ's determination that [the claimant] could perform other work existing in the national economy does not rest on substantial evidence").

As discussed above, the Court has determined the ALJ failed to adequately consider the opinions of Dr. Willis, and did not adequately support his reasons for discounting Plaintiff's credibility. Accordingly, these errors may have infected the hypotheticals that the ALJ relied on, and in turn, the ALJ's determination at step five. Therefore, the Court finds the ALJ's determination at step five is not supported by substantial evidence.

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to grant benefits, or in the alternative remand this case further proceedings. "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick v. Chater*, 157 F.3d at 728. If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th

Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate. On remand, the ALJ shall reconsider the weight he applies to Dr. Willis's opinion, and evaluate the Plaintiff's credibility in accordance with this decision.

## VI. CONCLUSION

Based on the foregoing findings, the Court orders that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED this 31st day of March, 2018.

_____

TIMOTHY J. CAVAN
United States Magistrate Judge